**Thomas OSES, Petitioner,**

v.

**COMMONWEALTH OF MASSACHUSETTS, Respondent.**

**Civ. A. No. 89–0487–WD.**

United States District Court, D. Massachusetts.

Oct. 7, 1991.

Stephen B. Deutsch, Robert N. Mc-Donald, Foley, Hoag & Eliot, Boston, Mass., for petitioner.

Jill S. Plancher, Office of the Atty. Gen., Crim. Bureau, Boston, Mass., for respondent.

## MEMORANDUM

WOODLOCK, District Judge.

Thomas Oses brings this petition for a writ of habeas corpus alleging that his 1977 convictions in the Norfolk County Superior Court for armed assault in a dwelling and kidnapping were obtained in viola-

tion of his constitutional rights. He challenges both the decision of the pretrial motions judge to permit him to proceed *pro se* and the conduct of the ensuing trial by a different judge of the Superior Court.

The petition illustrates the prescience of Justice Jackson's observation that "[t]he responsibility for fair and orderly trial must be carried by the trial judge or hope of attaining it be abandoned." [1] This is in large part because the trial judge "works in an atmosphere of strife, with counsel, litigants and often witnesses and spectators bitter, biased and partisan; and, if the presiding judge fails of his part, they become demonstrative and disorderly." [2] Thus, "[s]ome of the [very] best trial judges ... [are] distinguished ... [by] wisdom and common sense and a personality that enable[s] them unostentatiously to dominate the courtroom and be master of its proceedings." [3]

The conduct of Judge Mason, the judge presiding over the pretrial matters arising in the state criminal proceeding at issue here, was a journeyman example of the ideal Justice Jackson outlined. With firm and careful competence, Judge Mason addressed the knotty question of self-representation that the defendant-petitioner presented before trial and now challenges in the instant petition. Judge Mason's full and candid inquiry of the defendant-petitioner fairly resolved the competing policy interests brought into play when a criminal defendant contemplates self-representation. Judge Mason's conduct provides no basis for the relief Oses seeks.

By contrast, the conduct of Judge Chmielinski, the judge presiding over the actual trial of the state criminal proceeding, was the obverse of Justice Jackson's ideal. Judge Chmielinski did not merely "fail of his part" in that trial, he periodically competed with an obstreperous *pro se* defendant in an ostentatiously demonstrative un-

dermining of the basic attributes of a fair and orderly proceeding. The record of trial conduct presented to me for review is suffused with an atmosphere of unfairness and deprecation of the defendant. This atmosphere was generated by incidents in which Judge Chmielinski acted out what was at best a grudging and sardonic adherence to the formalities of proper trial procedure without implementing the substance of fair practice. His deficient conduct of the trial was administered in the constitutionally charged context of *pro se* representation; and the result was a conviction unconstitutionally obtained. Accordingly, relief must be afforded the petitioner.

## I.

On January 11, 1977, a grand jury indicted Thomas Oses, a 19–year–old with a sixth grade education, and codefendant William Sheppard for armed assault in a dwelling and kidnapping. The incidents leading to the indictments in this case occurred on and about December 26, 1976, and Oses and Sheppard were arrested at their conclusion.[4] Oses retained Attorney Melvin Levine to represent him; it appears Attorney Levine had handled a number of motor vehicle cases for Oses in the past. Sheppard, who had been shot during the incident and was in the hospital in serious condition for several weeks thereafter, was represented by court-appointed counsel, Martin Gideonse. Between February and May of 1977, these counsel engaged in various negotiations with the prosecutor, Robert Banks, regarding discovery and other pretrial matters. The trial date was initially scheduled for April 20, 1977, but unresolved motions regarding, among other things, pretrial publicity prevented the trial from going forward at that time. The defendants were incarcerated at separate institutions during those months.

---

1. Jackson, *The Advocate: Guardian of Our Traditional Liberties*, 36 A.B.A.J. 607, 610 (1950).

2. *Id.*

3. *Id.*

4. *See Commonwealth v. Oses* [26 Mass.App.Ct. 1116, 530 N.E.2d 814 (table)], Massachusetts Appeals Court No. 88–P–191, slip op. at 468 & nn. 2 & 3 (November 21, 1988), an unpublished memorandum attached hereto as Appendix A, for a summary of the facts of the alleged kid-

## A. *The Decision to Proceed* Pro Se

On May 9, 1977, the defendants appeared before Judge Mason in the Norfolk Superior Court, and counsel for both defendants presented motions to withdraw from the case. Oses and Sheppard indicated that they wanted to try the case themselves, and that they wanted time together in order to prepare their defense. There was also some discussion about attempts by Oses to retain another attorney, Frank Kelleher, to represent him in this case. A representative of Kelleher addressed the court at the May 9, 1977, hearing and indicated that Kelleher was representing Oses before the Massachusetts Supreme Judicial Court ("SJC") on a bail reduction hearing on another case. Kelleher's representative told the court Kelleher wished to enter an appearance in the case only if the case could be continued to the September session; "[o]therwise, the matter should go forward as suggested." Oses told the court he had not discussed the instant case with Kelleher and that "[t]he only thing Mr. Kelleher and me have agreed on is the fact that he is going to take me to the Supreme Court for bail reduction."

The prosecutor strongly objected to any continuance, accusing the defendants of using "every tactic imaginable to delay the trial of this case." He indicated that the case had been given high priority by his office and requested a June 6, 1977, trial date. Defense counsel argued that only

one prior date had been set, and that numerous valid pretrial motions had been outstanding at that time, some of which were still unresolved. The defendants then renewed their request to defend themselves, stating that they, too, wanted the case tried as soon as possible, so that they could prove their innocence.

Judge Mason spoke extensively and pointedly to the defendants, advising them that they were represented by able counsel and cautioning them to think very carefully about dispensing with that representation. Among other things, the judge said, "You know, when you have medical problems, you want to see a doctor. When you have legal problems, you should see a lawyer." [5] Oses and Sheppard repeated their desire to represent themselves, telling the court they could be ready for trial on June 6th with Attorneys Levine and Gideonse acting as co-counsel. The judge indicated that he would hold the matter over for two days to review the entire file, but that June 6th seemed an appropriate trial date from the information then before him.

Two days later, the issue of the June 6, 1977, trial date was again taken up by Judge Mason.[6] After warning the defendants once again about the seriousness of proceeding *pro se* and the fact that the matters were ready for trial on June 6th, the judge allowed Oses and Sheppard to argue their motion.[7] There was additional discussion about incarcerating the defen-

---

napping and assault presented as evidence during the trial.

5. Judge Mason further warned Oses and Sheppard:

> You talk about your constitutional right to represent yourself.... That is fine if that is what you really intend and that is what you really want to do and this Court at an appropriate time will hold a hearing to make certain in its mind that this is appropriate for you to do. But I point out to you that when you have the opportunity and the constitutional right, shall we say, of being represented by counsel, ... and you go to trial without the benefit of counsel, then I don't think you are thinking very straight.

6. At that hearing, the assistant district attorney argued that the defendants actually had filed a speedy trial motion; and the judge later referred to the defendants' request for a speedy

trial. No reference to a speedy trial motion having been filed appears in the record, however.

7. *See generally* Transcript, Hearing Re: Status of Counsel and Setting of Trial Date, May 11, 1977, at 16–26. Judge Mason again apprised the defendants at length of the potential risks of proceeding without counsel. He then questioned both defendants regarding their knowledge of trial procedures. Oses asserted that he would know what to do procedurally, and that he would be better able to communicate with his witnesses and present his defense than Attorney Levine. After further warnings by the judge, Oses said, "I understand it. We both know all about it and understand it very well.... I am requesting to defend myself. I think I know what I am doing. I know what I am doing. I intend to prove the fact that I am innocent." He also repeated his lack of confidence in Attorney Levine.

dants at the same institution so that they could jointly prepare their defense; then, Judge Mason made the following findings:

Both counsel have indicated their willingness to be standby counsel in this matter and I am making a finding that each of these defendants have (sic) willingly and intelligently and voluntarily waived his right to have counsel represent him in this matter and they are allowed to represent themselves in this case with both Mr. Levine and Mr. Gideonse as standby counsel.

Both defendants then signed waiver of counsel forms, modified, at their request, to provide that the waiver only applied to the trial stage of their cases. A final pre-trial hearing was held on May 19, 1977, at which time Judge Mason addressed several unresolved discovery matters and ordered the trial to commence on June 6, 1977. At the May 19th hearing, Oses told the court he thought the trial date of June 6th was too far in the future and asserted that he and Sheppard were ready for trial "any time now." Expressing the same sentiments, Sheppard asked Judge Mason, "Is there any other date available before June 6?" The judge indicated that there was not.

## B. *The Trial*

The trial began in the Norfolk Superior Court on June 6, 1977, before Judge Chmielinski. Both defendants represented themselves at trial, with Attorneys Levine and Gideonse appointed by the court as standby counsel to assist them. On that day and the next, the judge acted on numerous pre-trial motions filed by both defendants. In particular, he denied a motion that Oses be present at and be allowed to participate in bench and lobby conferences, stating that he did not intend to have any lobby or bench conferences, but that "everything [would] be done in the open courtroom wherever possible." Tr. II, at 12. He also denied Oses's motion to have freedom of movement during cross-examination. Tr. II, at 10. At times during the trial, Oses conducted his examinations of witnesses while wearing leg irons and, at one point, wrist manacles.

Several difficulties were apparent from the outset of the trial. Attorney Levine attempted to withdraw as standby counsel twice on the first day, telling the court that Oses had "threatened" him and warned him not to be present during the trial. Tr. I, at 42-44. When Attorney Levine again informed the judge on the third day that Oses did not want him present, Judge Chmielinski simply responded, "I don't care what he wants." Tr. III, at 27.

During the jury impanelment, there were numerous heated exchanges between Oses and the judge, resulting in a contempt citation for Oses and with a sentence to six months imprisonment imposed in the presence of the jury panel. While it is clear on the record that Oses was being extremely argumentative and making impanelment quite difficult, it appears that the difficulties did not result from his behavior alone. For example, at one point, Oses called the judge's attention to what he said was some physical and verbal abuse being inflicted upon him by one of the court officers. With the jury panel present, he asked the judge to put a stop to the harassment. Judge Chmielinski responded by telling the court officer in what appears to have been an effort at humor, "Will you please stop harassing them, Mr. Tynan. That is very naughty of you." Tr. III, at 23.

Starting during jury impanelment, the judge also began holding conferences in the lobby with only standby counsel present. He continued this practice throughout the trial, despite both the obvious breakdown in the relationship between Oses and his standby counsel and his earlier assurance that he would not be holding such conferences. Eventually, at their request, the defendants were provided with transcripts of the bench and lobby conferences after the conferences had taken place.

References to a variety of other incidents that occurred during the presentation of evidence are discussed in greater detail in Part III below. Overall, it is painfully clear from the record that the trial began as a difficult and confusing situation and

deteriorated throughout its month-long duration.

On the merits, the evidence against the defendants was quite substantial. However, the defendants mounted a vigorous, if ineffective, defense, in which they sought to attack the credibility of the Commonwealth's case and to present an alibi. The ineffectiveness of defendants' *pro se* representation was such that Judge Chmielinski candidly—and apparently without awareness of his own responsibility for the conduct of the proceeding—told counsel at side bar outside the presence of the defendants that "[t]his is absolutely the most ridiculous thing I have ever seen in my whole life." Tr. XIII, at 12.

The trial was punctuated with frequent confrontations between Oses and the judge, and Oses and the assistant district attorney, many of which occurred in the presence of the jury. These confrontations served to belittle and demean Oses and his *pro se* representation before the jury, while at the same time relentlessly forcing the unruly proceeding toward a conclusion by jury verdict. Most dramatically, on the seventeenth day of the trial, a fight broke out when a court officer, upon the judge's instruction, attempted to place a gag in Oses's mouth during cross-examination of Oses's mother by the assistant district attorney. Codefendant Sheppard rose to Oses's defense and attacked the court officers who had approached him; the record indicates that it took six court officers to subdue Sheppard. Attorney Gideonse moved for a mistrial following this incident, with Oses joining in ("That goes double for me." Tr. XVIII, at 15.) These motions were denied. And when the trial continued the next day, Judge Chmielinski offered the jurors only a formulaic and patently ineffective instruction to "disregard" the "explosive situation" they had witnessed and not hold it against either defendant. Tr. XVIII, at 27–28.

The case was submitted to the jury on July 7, 1977. The next day, the jury returned a verdict of guilty on all counts of the indictments against both defendants.

### C. *Post Trial Proceedings*

Oses was originally sentenced to life imprisonment on the armed assault conviction, and 12–20 years on and after for the kidnapping. Later, the Appellate Division of the Superior Court modified that sentence to have the two terms run concurrently.[8] Oses originally claimed an appeal from these convictions on July 19, 1977, but his appeal did not reach the Massachusetts Appeals Court until 1988.[9] The Appeals

---

8. Co-defendant Shepard was sentenced to 10–12 years on the armed assault charge, with 8–10 years concurrent for the kidnapping, and 1 year on and after for a weapons charge for which he alone had been indicted.

9. Neither party makes any issue of this extraordinary delay in the resolution of Oses's appeal. The record indicates that, at the time Oses filed his original claim of appeal on July 19, 1977, he also filed a motion for appointment of counsel. Judge Chmielinski denied the motion. Oses filed a second motion to have counsel appointed which was also denied by Judge Chmielinski. Judge Chmielinski also denied Oses's *pro se* motions to revise and revoke his sentence (September 16, 1977) and for a copy of the entire trial transcript (September 22, 1977). The docket indicates that the summary of the record was filed on January 9, 1978, and that the Commonwealth filed a motion to dismiss the appeal on June 5, 1978. The docket then reflects that a hearing on this motion was continued to August 3, 1978.

The next entry on the docket is the defendant's motion for leave to proceed *in forma pauperis* dated April 17, 1980, and allowed by Judge Chmielinski on May 7, 1980. On September 22, 1981, Judge Chmielinski denied Oses's Motion for Writ of Habeas Corpus without hearing, and ruled no action was required on the motion to proceed *in forma pauperis*. Oses filed another motion to proceed *in forma pauperis* and for appointment of counsel on May 11, 1982; on May 13, 1982, Judge Dwyer appointed Attorney Bernard Grossberg to represent Oses as to all postconviction matters. After a motion for reconsideration of Oses's motion to revise and revoke was allowed, Judge Barton denied, after hearing, the motion to revise and revoke on September 6, 1983. On April 24, 1984, Judge Dwyer allowed defendant's motion for counsel to withdraw, and Attorney Harold Robertson was appointed. Oses filed a motion for a new trial on July 25, 1985, which was denied by Judge Barton on March 7, 1986. On February 4, 1987, Oses filed a *pro se* motion for release from unlawful restraints pursuant to Mass.R.Crim.P. 30(a).

An order dated March 30, 1987, was entered by the Appeals Court appointing the Committee for Public Counsel Services to represent Oses and directing that the defendant's appeal be

Court affirmed Oses's convictions, 26 Mass. App. 1116, 530 N.E.2d 814 (1988), in an unpublished Memorandum and Order dated November 21, 1988, attached hereto as Appendix A. On February 1, 1989, the SJC denied Oses's petition for further appellate review without written opinion. 404 Mass. 1101, 536 N.E.2d 612 (1989).

Proceeding *pro se*, Oses thereupon filed with this court his original handwritten petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After the Commonwealth filed its response, Oses filed a second, typewritten habeas petition purporting only to restate his original claims and support them with pertinent legal decisions. The Commonwealth filed no further response to this petition, and has not objected to the second petition. This court appointed counsel for Oses and issued a procedural order establishing a briefing schedule.

Assisted by counsel, Oses filed an extensive Memorandum in Support of the Petition of Thomas Oses for a Writ of Habeas Corpus. Oses' claims for relief involve three basic contentions:

(A) That he was deprived of constitutional representation because he did not voluntarily and intelligently waive his sixth amendment right to counsel;

(B) That the conduct of his trial was unconstitutional because (1) he was denied his sixth amendment right to represent himself by: his exclusion from bench and lobby conferences, the physical restrictions on his mobility in the courtroom, the "sarcastic and prejudicial comments by the trial judge," and the "pejorative comments and prejudicial conduct by the prosecutor," and (2) he was denied his fifth amendment right to due process by the trial judge's impermissible comment on his decision whether to testify on his own behalf; and

(C) That the jury was instructed unconstitutionally by the trial judge's mischarac-

terization of the reasonable doubt standard.

In its Memorandum in Opposition to Petition for a Writ of Habeas Corpus, the Commonwealth argues that this court must dismiss Oses's petition because several of his claims for relief were not exhausted in the state court. Specifically, the Commonwealth asserts that the trial conduct claims were not fairly presented to the state courts before Oses sought federal habeas review. Assuming, *arguendo*, that Oses's claims are deemed exhausted, the Commonwealth maintains that the court should dismiss the petition because Oses has failed to demonstrate that he is entitled to relief on the merits of his claims.

## II.

### *Exhaustion*

■ The exhaustion doctrine embodies the long-standing rule that, to respect sovereignty and promote comity between the state and federal courts, a state prisoner must normally exhaust all available state remedies before a federal court can grant a writ of habeas corpus. *Duckworth v. Serrano*, 454 U.S. 1, 3–4, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981); *Mele v. Fitchburg Dist. Court*, 850 F.2d 817, 819 (1st Cir.1988), 884 F.2d 5 (1st Cir.1989). This principle is codified in 28 U.S.C. §§ 2254(b), (c) which provide:

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

(c) An applicant shall not be deemed to have exhausted the remedies available in

processed. CPCS Attorney Douglas Marshall filed a *memorandum in opposition to the Com*monwealth's motion to dismiss the appeal on August 25, 1987, and Judge Izzo denied the Commonwealth's motion after a hearing. On December 7, 1987, Judge Warner ordered that

the stay of his order to process the appeal be vacated and that the appeal proceed. Notice of Assembly of the Record was sent by the Norfolk Superior Court on February 18, 1988, and Notice of Docketing of Appeal (# AC 88–P–191) was dated February 22, 1988.

the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

*See Mele*, 850 F.2d at 819. Thus, federal courts are generally precluded from considering questions posed in a habeas petition until the highest court of the state has exercised its powers over the claims. *See id.* (citing *United States ex rel. Kennedy v. Tyler*, 269 U.S. 13, 17, 46 S.Ct. 1, 2, 70 L.Ed. 138 (1925)).

▆▆▆▆ The Commonwealth has argued that two of Oses's claims—denial of his sixth amendment right to proper representation and violation of his fifth amendment right to remain silent—were not sufficiently presented to the state court to satisfy the exhaustion requirement.[10] According to the Supreme Court, the exhaustion requirement is met "once [a] federal claim has been fairly presented to the state courts." *Castille v. Peoples*, 489 U.S. 346, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)). For a claim to be fairly presented, the habeas petitioner must have submitted the *substance* of his or her federal claim to the state courts, so that the state courts were actually given the opportunity to confront and correct any constitutional infirmity. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982); *Dougan v. Ponte*, 727 F.2d 199, 200–01 (1st Cir.1984); *Williams v. Holbrook*, 691 F.2d 3, 6, 9 (1st Cir.1982).

▆▆▆▆ The First Circuit has outlined four factors to serve as guidelines for determining whether the substance of a federal claim was adequately presented to the state courts. *Nadworny v. Fair*, 872 F.2d 1093, 1095, 1097–98 (1st Cir.1989) ("exhaus-

tion determinations of this genre are by their very nature case-specific ... [t]he proper search is a search for the heart of the matter, not for ritualistic formality"). If in the state courts the habeas petitioner has (1) cited a specific federal constitutional provision, (2) relied on federal constitutional precedent, (3) claimed a specific right protected under the federal constitution, or (4) presented a federal constitutional claim in such a manner that it was likely to alert the state court to the federal nature of the claim, then federal courts may conclude that the petitioner exhausted his or her claims. *Id.* at 1097. The *Nadworny* court further explained that, in applying the fourth criterion, courts should focus on "the *likelihood* that the presentation in the state court alerted that tribunal to the claim's federal quality and approximate contours.... The inquiry ... is foremost a question of probability." *Id.* at 1098.

Throughout his appeals in both the state and federal courts, Oses has advanced the same essential legal theory: that he was denied due process and a fair trial by the actions of the motions judge, the trial judge and the prosecutor (and perhaps even standby counsel) in violation of his fifth, sixth and fourteenth amendment rights. In both his Appeals Court brief and his brief to the SJC, he asserted these claims in a list of eight questions presented;[11] his habeas petition to this court essentially consolidated these questions into the four basic claims of constitutional violation. While the form of Oses's constitutional arguments to the state courts may have changed, however, the substance has remained the same. *See Lanigan v. Maloney*, 853 F.2d 40, 44–45 (1st Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). Thus, I find that the state courts were accorded a fair opportu-

---

**10.** The Commonwealth does not argue that Oses failed to exhaust his other two claims, that his waiver of his right to counsel violated his sixth and fourteenth amendment rights because it was not made knowingly, voluntarily and intelligently, and that the trial judge improperly instructed the jury on the reasonable doubt standard. Because the requirement is one of total exhaustion, however, *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379

(1982), the Commonwealth argues that the failure to exhaust two of the four claims requires dismissal of the entire petition.

**11.** See Brief of Defendant to the Massachusetts Appeals Court, April 19, 1988, at 1–2; Brief of Defendant, Application for Further Appellate Review to the SJC, December 29, 1988, at 4–5.

nity to confront the substance of Oses's federal claims.

### A. Interference with Self-Representation

■ In his petition, Oses claims that he was denied his sixth amendment right to represent himself by his exclusion from bench and lobby conferences, by restrictions placed on his mobility in the courtroom, and by pejorative comments and other misconduct by the trial judge and the prosecutor. In both his Appeals Court brief and his brief for further appellate review, Oses listed these factors separately, alleging that each deprived him of due process and prevented him from obtaining a fair trial. The facts of each of these claims were squarely presented to the state courts. The respondent alleges, however, that the substance of the sixth amendment claim encompassing these four individual factors was never before the state courts. Thus, the Commonwealth argues that the sixth amendment claim is unexhausted.

The Commonwealth's arguments demonstrate precisely the focus on form over substance that the First Circuit counseled against in *Nadworny*. 872 F.2d at 1096–97, 1101. Oses may not have bottomed his arguments to the Appeals Court exclusively on a claim of denial of self-representation under *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); yet that is essentially what he argued to the Appeals Court on pages 26–27 of his brief to that court, writing:

In *Commonwealth v. Mott* [2 Mass. App. 47, 308 N.E.2d 557], the Appeals Court held that there was a denial of defendant's rights "... to be fully heard in his defense by himself, or his counsel, at his election," as secured by article 12, Massachusetts Declaration of Rights; ... The corresponding federal right is secured by the Sixth and Fourteenth

Amendments to the Constitution of the United States, *Faretta v. California*, 422 U.S. 806, 812 [95 S.Ct. 2525, 2529, 45 L.Ed.2d 562] (1975).

In dealing with the representation issue, the judge kept one foot in the boat and one foot on land ... [H]e allowed the defendant to conduct part of the case, while excluding him from bench and lobby conferences which are, of course, where critical questions pertaining to evidentiary rulings, jury instructions, etc., are discussed. The judge required that defendant remain at counsel table, with leg irons on (and at one point with wrist manacles also), rather than allow him to walk freely in the courtroom while conducting direct and cross examination. The judge's decision also meant that many heated arguments between the judge and defendant, acting as counsel, would occur before the jury, rather than at the bench or in the judge's lobby.

Thereafter, Oses discussed the numerous examples of prejudicial comments and actions by the judge and prosecutor which further eroded his appearance of self-representation throughout the trial.[12] Clearly, the *"likely"* effect of these arguments by Oses, including his reliance on the precise federal constitutional precedent on point, was to alert the state court to the federal nature of his claims in the manner contemplated by *Nadworny*. *See* 872 F.2d at 1101 ("claim need not be argued in detail nor separately presented; but its federal quality—demarcated by one of our suggested guidelines or so substantively federal that the prototypical (reasonable) jurist would understand that a federal claim had been presented—must be readily apparent").

The federal quality of Oses's claim was apparent to the Appeals Court, which discussed the claim at length, making reference to federal precedent, in its opinion affirming his convictions. The Appeals

---

12. *See, e.g.,* Defendant's Appeals Court Brief at 30 ("prosecutor, in front of the jury, improperly asked that defendant's remarks be stricken and that he be instructed as to the 'ignorance' of his remarks"); *id.* at 36 (after several improper attempts by defendant to object, "judge respond-ed ... by telling the defendant before the jury: 'Shut up. You seem to have a chronic inability to keep that mouth shut.' ... The impression that the jury must have been left with was that Oses was not supposed to speak up at all, and that when he did, he was acting improperly.").

Court considered each of the four elements cited by Oses in light of the Supreme Court's determinations that a defendant has a constitutional right to proceed *pro se*, citing *Faretta*, and that a defendant is thereby entitled "to preserve actual control" over his defense, "without ... [destruction of] the jury's perception that the defendant is representing himself," citing *McKaskle. See Commonwealth v. Oses, infra* at 470–72.[13] The First Circuit has been careful to point out that a habeas petitioner need only demonstrate that he presented the federal claims to the state court, not that those courts either addressed or decided those claims. *Dyer v. Ponte,* 749 F.2d 84, 86 n. 1 (1st Cir.1984); *Williams,* 691 F.2d at 8. Where, as here, the state court did address them, and cited specific federal cases on point, there is abundant confirmation that the state court was sufficiently alerted to the petitioner's federal claims. *See Nadworny,* 872 F.2d at 1100; *Brown v. Streeter,* 649 F.Supp. 1554, 1557 (D.Mass.1986), *aff'd without op.,* 836 F.2d 1340 (1st Cir.1987).[14] Thus, I conclude that Oses's claim that he was denied his sixth amendment right to self-representation has been exhausted.

B. *The Impermissible Comment Claim*

■ The same considerations lead to the conclusion that Oses has exhausted his claim that a comment by the trial judge which gave the jury the impression Oses would testify violated his fifth and fourteenth amendment rights. The Commonwealth acknowledges that this claim was fairly presented to the Appeals Court, having been discussed explicitly in the Defendant's Appeals Court Brief, with references to federal authority, at pages 41–43. But the Commonwealth argues that the SJC was not alerted to the federal constitutional nature of Oses's claim because he challenged the improper remark by charging only that his due process rights were "further prejudiced by judicial misconduct." This argument is entirely unconvincing.

Question V of Oses's Brief to his Application for Further Appellate Review read: "Was the defendant prejudiced by the judge telling the defendant, in front of the jury, that he can talk about a particular topic 'when you testify, I suppose'?" While Oses did not explicitly cite the fifth amendment, it is difficult to imagine how any "prototypical" member of the SJC would fail to recognize the federal due process implications of such a comment by a trial judge in the presence of a jury. *See Nadworny,* 872 F.2d at 1101; *see also Williams,* 691 F.2d at 6 (recitation by petitioner of "book and verse" of constitutional provisions relied upon is not necessary for exhaustion). Here again, it bears emphasizing that the task is to consider the *likelihood* that the state court was alerted to the federal contours of the claim; and here, again, that likelihood approaches certainty. *Compare Lanigan,* 853 F.2d at 42 (petitioner's skeletal objection "*Commonwealth versus Webster* [59 Mass. 295 (1850) ] in my instructions" sufficiently understood by everyone as an objection to the reasonable doubt standard).

Having concluded that Oses has exhausted all claims presented in his habeas peti-

---

**13.** In considering Oses's ability to represent himself before the jury, the Appeals court specifically discussed his exclusion from bench and lobby conferences, at 471–72; the restraints on his movements, at 471–72; the derogatory comments by the prosecutor, at 472; and the derogatory comments by the judge, at 472. With regard to the latter two, the court noted:

These comments and admonitions, in the course of a long trial, considered individually, probably would not lead us to order a new trial, despite the fact that some of them were demeaning, or sarcastic, or tended to ridicule Oses.... Cumulatively, however, we recognize they may be of greater significance when

viewed in connection with the judge's failure to permit Oses, a pro se defendant, to participate in bench and lobby conferences. At 472.

**14.** In his application to the SJC for Further Appellate Review, Oses presented the identical list of claimed violations of his rights. He engaged in the same factual discussion of each of the four factors he believed deprived him of his ability to represent himself properly in the eyes of the jury. *See* Defendant's Further Appellate Brief at 9–13. As with the Appeals Court, the SJC received sufficient notice from the Application for Further Appellate Review. *See Mele,* 850 F.2d at 820–21.

tion, I turn next to the merits of those claims.

## III.

### A. *The Waiver of Counsel Claim*

■ The sixth and fourteenth amendments to the Constitution guarantee an accused the right to represent himself in a state criminal proceeding as long as that right is exercised knowingly, voluntarily and intelligently. *Faretta v. California*, 422 U.S. 806, 819, 835, 95 S.Ct. 2525, 2533, 2541, 45 L.Ed.2d 562 (1975).[15] Because of the substantial benefits traditionally associated with representation by counsel, the Court has required that a defendant "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)); *see also United States v. Hafen*, 726 F.2d 21, 25–26 (1st Cir.), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984); *Maynard v. Meachum*, 545 F.2d 273, 277–79 (1st Cir. 1976). A defendant who makes such a choice at trial, is convicted, and later seeks habeas corpus relief bears the burden of demonstrating that his waiver was not

competently and intelligently made. *Meachum*, 545 F.2d at 277–78.

■ Oses makes such a claim in his petition for habeas corpus relief. First, he alleges that Judge Mason improperly denied his request for a three-month continuance to enable Oses to engage substitute counsel for his defense. Arguing that he was thereby presented with the constitutionally offensive choice of accepting counsel he did not trust or proceeding *pro se*, Oses states that the decision to choose the latter was not voluntary.[16]

At the outset, I note that the record does not indicate that Oses ever made any formal request for a continuance. Although Attorney Kelleher may have needed three months to prepare for trial, Oses explicitly informed Judge Mason that he had not retained Kelleher.[17] Rather, the record contains the repeated requests by both defendants to proceed to trial immediately. Perhaps this desire on the part of the defendants to proceed to trial "as soon as possible" so they could "prove [their] innocence" was ill-advised or, at least, naive. But it was not the result of any improper denial of a continuance by Judge Mason.[18]

■ It is true that one of the reasons given by Oses for wishing to proceed *pro se* was his lack of confidence in Attor-

---

**15.** An accused's right either to defend in person or to be defended by counsel is guaranteed by Article 12 of the Massachusetts Constitution's Declaration of Rights as well. Mass. Const., pt. 1, Art. 12.

**16.** Oses further argues that his choice was neither knowing nor intelligent, because he did not realize he would be precluded from attending bench and lobby conferences, subjected to physical restraints, and ridiculed by the prosecutor and the judge, all in derogation of his right to represent himself. These events certainly implicate Oses's right to self-representation, as discussed in part III.B.(1) below, but they are separate issues from the voluntariness of the waiver question itself.

**17.** In fact, Kelleher actually appeared in court on the first day of trial. He explained that, although he had discussed the case with Oses and had given him some motions to file, "I am not the attorney of record and I don't desire to

be and I don't desire to be appointed to assist him in the course of the trial." Tr. I, at 37.

**18.** Had there been a request for a continuance, it would have been within the judge's broad discretion to decide whether to grant or deny it. *Barham v. Powell*, 895 F.2d 19, 22 (1st Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 2572, 109 L.Ed.2d 754 (1990); *Tuitt v. Fair*, 822 F.2d 166, 171–73 (1st Cir.), *cert. denied*, 484 U.S. 945, 108 S.Ct. 333, 98 L.Ed.2d 360 (1987); *United States v. Torres*, 793 F.2d 436, 440–41 (1st Cir.), *cert. denied*, 479 U.S. 889, 107 S.Ct. 287, 93 L.Ed.2d 261 (1986). In evaluating the judge's decision, all the circumstances of the case are considered, and "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Barham*, 895 F.2d at 22 (quoting *Torres*, 793 F.2d at 440 (further citations omitted)). A denial that effectively denies an accused the ability to represent himself may constitute such an abuse of discretion. *Id.* No such denial occurred in this case.

ney Levine's ability to represent him. He argues that he was thus placed in the "untenable position" of being represented by an attorney he no longer trusted or representing himself. The law is clear, however, that there is no absolute right to counsel of one's own choice. *United States v. Pina*, 844 F.2d 1, 6 (1st Cir.1988); *Meachum*, 545 F.2d at 278; *see also Commonwealth v. Appleby*, 389 Mass. 359, 367–68, 450 N.E.2d 1070 (1983), *cert. denied*, 464 U.S. 941, 104 S.Ct. 357, 78 L.Ed.2d 320 (1983); *Commonwealth v. Cavanaugh*, 371 Mass. 46, 53–54, 353 N.E.2d 732 (1976). Unless the defendant is placed in the position of having to proceed with incompetent or unprepared counsel, his refusal to proceed with appointed counsel is a "voluntary" waiver of his sixth amendment rights. *Pina*, 844 F.2d at 6 ("while a defendant may not be forced to proceed to trial with an incompetent or unprepared counsel, the court has no obligation to appoint a lawyer outside the public defender's office simply because a defendant believes all lawyers from that office are incompetent"); *Meachum*, 545 F.2d at 278 (court may require defendant to go forward even if he is not entirely satisfied with his attorney). Here, the record reveals neither unpreparedness nor incompetence, and Oses has not established that he was placed in any constitutionally untenable position.

■ In fact, the record amply demonstrates that Oses's election to proceed *pro se* was entirely knowing and voluntary. Massachusetts has required its trial courts to conduct an inquiry to ensure the voluntariness of a defendant's decision to represent himself, as well as the defendant's awareness of the risks that such representation entails. *Tuitt*, 822 F.2d at 176 (citing *Commonwealth v. Cavanaugh*, 371 Mass. at 46, 353 N.E.2d 732; *Commonwealth v. Chapman*, 8 Mass.App.Ct. 260, 265, 392 N.E.2d 1213 (1979); *Commonwealth v. Mott*, 2 Mass.App.Ct. 47, 308 N.E.2d 557 (1974)). By contrast, the courts of this circuit do not require the federal trial courts to issue any specific warnings or make any specific findings of fact on the issues of whether the decision to represent oneself "was knowing, voluntary and intel-

ligent." *United States v. Benefield*, 942 F.2d 60, 64 (1st Cir.1991). Rather, these courts consider whether the accused had a "sense of the magnitude of the undertaking and the 'disadvantages of self-representation' ... an awareness that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story." *Meachum*, 545 F.2d at 279 (citing *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541). In evaluating knowledge and voluntariness, courts may consider such factors as the defendant's background, conduct, experience, previous criminal trials, prior representation by counsel, and availability of advisory counsel at trial. *Hafen*, 726 F.2d at 25 (citing *Meachum*, 545 F.2d at 279).

During the course of the three pretrial hearings in this case, Judge Mason gave the defendants numerous and explicit warnings regarding the dangers of self-representation. He required Oses to present on the record his reasons for proceeding *pro se*, and inquired at some length into his ability to present his own defense, correcting several of the defendant's misconceptions and addressing specific concerns such as the use of materials obtained during discovery. He also conditioned Oses's self-representation on the retention of Attorney Levine as standby counsel. Oses signed the waiver indicating that he knowingly and voluntarily relinquished his right to counsel at trial. While the ultimate circumstances of the trial demonstrate just how inadvisable Oses's decision was, the circumstances of the initial waiver of counsel met all constitutional requirements; there was nothing further that Judge Mason should have or could have done in light of Oses's insistence on his right to represent himself.

### B. Trial Conduct Claims

■ On July 7, 1977, the twenty-third day of Oses's trial, Judge Chmielinski began his charge to the jury with the following observation:

Good morning, ladies and gentlemen of the jury. We have come to the end of a long and somewhat disorganized trial.

First, I would like to apologize to you all for the lateness of our getting started. I would like to have you keep in mind that we did have two defendants here who were really not too well versed in court procedure and irrespective of the fact that I was here and the attorneys were here and you were here and we all wanted to get started on time, there were delays, which were really not the fault of anyone and can only be attributed to inexperience rather than design. But please accept my apologies for that because I realize that the trial was prolonged to a certain extent because of these circumstances, over which, I can assure you, I had no control.

Tr. XXIII, at 3.

Those brief remarks provide an accurate and telling summary of Oses's trial before Judge Chmielinski. It was truly a trial in which Judge Chmielinski exercised no fair and effective control, particularly over his own actions. Indeed, his conduct of the proceeding was in disregard of well-settled and fully-articulated principles governing the function of the trial judge. Oses may have succeeded in his attempts to invoke his sixth amendment right to defend himself, but the conduct of the judge throughout the ensuing trial made it impossible for him to exercise that right in any constitutionally meaningful manner.

(1) Interference with Self–Representation

In *Faretta,* the Supreme Court held that the sixth amendment guarantees an accused "personally the right to make his defense," recognizing in doing so that it is "[t]he defendant, and not his lawyer or the State, [who] bear[s] the personal consequences of a conviction." 422 U.S. at 819, 834, 95 S.Ct. at 2533, 2541. The Court in *Faretta* forcefully stated the right of the defendant to maintain control of his defense.

The language and spirit of the Sixth Amendment contemplate that counsel ... shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists.

*Id.* at 820, 95 S.Ct. at 2533–34.

■ In *McKaskle v. Wiggins,* the Supreme Court further articulated the rights to be accorded a *pro se* defendant to assure that the constitutional principles recognized in *Faretta* are vindicated. 465 U.S. 168, 178–79, 104 S.Ct. 944, 951, 79 L.Ed.2d 122 (1984). The *McKaskle* Court explained:

First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right....

Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy.

*Id.* at 178, 104 S.Ct. at 951. With regard to the second dimension, the Court recognized that, for the jury, "the message conveyed by the defense may depend as much on the messenger as on the message itself," while, for the defendant, the right "lose[s] much of its importance if only the lawyers in the courtroom" know he is exercising it. *Id.* at 179, 104 S.Ct. at 951. Thus, any analysis of whether a defendant's sixth amendment right to self-representation has been violated must address both the extent of actual control he retained over his defense and the jury's perception of his status as one defending himself. *See id.* at 178–79, 104 S.Ct. at 951; *see also United States v. Torres,* 793 F.2d at 441–42 (*McKaskle* court "formulated a two-part test" to determine whether defendant had a fair chance to present his case in his own way).

■ The petitioner contends that "[t]he conduct, and in some cases, misconduct, of the judge and the prosecutor dur-

ing Oses's trial, combined with erroneous, or at least ill-conceived, rulings by the judge, effectively frustrated [his] attempt to defend himself," denying him both aspects of his *Faretta* rights. He frames the issue as a sixth amendment violation [19] and cites four specific examples of how his rights were violated. First, he claims that the judge's unjustified ruling excluding him from bench and lobby conferences deprived him of actual control of his defense and denied him the opportunity to be perceived by the jury as representing himself. Second, he claims that the physical restrictions placed on his mobility by the judge, with no inquiry into the least restrictive means necessary to address any significant safety concerns, further limited his control over his defense and influenced the jury's negative perception of his defense. Third,

he cites numerous sarcastic and prejudicial comments addressed to him by Judge Chmielinski during the trial, most of which were made in the presence of the jury, the overall effect of which could only have been to destroy his credibility, and the credibility of his defense, before the jury. Fourth, he points to certain extraneous and prejudicial comments and conduct by the prosecutor that further unfairly eroded the defendant's credibility in the eyes of the jury.

 The Commonwealth's response to these arguments is to treat each alleged instance of misconduct individually, arguing that each instance, even if improper, was not inherently prejudicial in the context of the entire trial. This treatment misreads *McKaskle*.[20] The appropriate

---

**19.** The petitioner apparently styles his claim as essentially one of sixth amendment violation in order to obtain a more sympathetic standard of review than under harmless error analysis. As the *McKaskle* Court noted, harmless error analysis is inapplicable to sixth amendment violations of this type. 465 U.S. at 177 n. 8, 104 S.Ct. at 950 n. 8. The Court explained, "[s]ince the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." *Id.* In its most recent pronouncement on the harmless error rule, the Supreme Court affirmed that the right to self-representation at trial remains in the "category of constitutional errors which are not subject to harmless error." *Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (citing *McKaskle,* 465 U.S. at 177–78 n. 8, 104 S.Ct. at 950–51 n. 8).

By contrast, a fifth amendment due process claim would not benefit from the rigorous standard applicable to sixth amendment violations. The fifth amendment standard is the more flexible inquiry whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974); *see also Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). As will become apparent, however, the standard of review is not outcome determinative in this case because I am satisfied the misconduct here, although properly styled as violative of the sixth amendment, was so sufficiently egregious as to constitute a due process violation which cannot fairly be termed harmless.

**20.** In its brief, the Commonwealth questions the applicability of the teachings of *McKaskle,* a

1984 decision, to this 1977 trial, citing the recent Supreme Court decision in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). The Court in *Teague* held that on collateral review, new constitutional rules of criminal procedure will not be applicable to those cases in which the convictions became final before the new rules were announced, unless they fall within one of two narrow exceptions not applicable here. 109 S.Ct. at 1075. The SJC has adopted the same standard of retroactivity. *Commonwealth v. Bray,* 407 Mass. 296, 299–301, 553 N.E.2d 538 (1990).

There is, however, no formal retroactivity problem presented by applying the standards outlined in *McKaskle* to the present case, because Oses's conviction did not become final until the SJC denied his Application for Further Appellate Review on February 1, 1989. *See also Nadworny v. Fair,* 744 F.Supp. 1194, 1210 (D.Mass.1990) (judgment of conviction became final after petitioner's conviction was affirmed by the Appeals Court, his petition for rehearing was denied by the SJC, and his petition for a writ of certiorari was denied by the United States Supreme Court). Indeed, on direct review, the Appeals Court discussed the circumstances of Oses's case in light of the standards set forth in *McKaskle. See* Appendix A at 470–72. Thus, this case does not implicate "the interests of comity and finality" with which the *Teague* Court was concerned when rules are applied on habeas review that were not in existence at the time the state court had its final say on the matter. *See Teague,* 109 S.Ct. at 1072–73.

More importantly, however, the principles from *McKaskle* upon which petitioner relies were hardly new. They can fairly be said to have been implicit in *Faretta.* Acknowledgment of these principles in 1977 required no exercise in speculation to anticipate *McKaskle*'s reading of the implications of *Faretta.*

question here is not simply whether each improper action or remark individually deprived Oses of his sixth amendment rights, but rather whether all the actions taken together deprived him of both actual control over his defense and the perception of such control in the eyes of the jury.

a. *Exclusion from Lobby and Bench Conferences.* The amount of actual control that Oses retained—or appeared to retain—over his trial was severely restrained by his exclusion from the lobby and bench conferences. Respondent argues that no constitutional violation resulted from this physical exclusion because standby counsel was present and "no significant trial issue" was resolved against him at these conferences. Yet Oses's constant objections to participation by standby counsel and his repeated attempts to have Attorney Levine removed from the case undermine any argument that his interests were sufficiently represented at these conferences. It is not enough to establish actual control by showing that, in the words of the respondent, "Oses filed motions, questioned witnesses and argued his cause." The *McKaskle* Court specifically held that where, as here, standby counsel speaks *"instead* of the defendant on any matter of importance, the *Faretta* right is eroded." 465 U.S. at 178, 104 S.Ct. at 951.[21] The judge's unilateral decision to conduct these conferences outside Oses's presence directly contradicted his earlier representation to the parties that no such conferences would be held. More fundamentally, that decision violated the petitioner's sixth amendment right to retain actual control over his defense.

Nor can Oses's exclusion from these conferences be justified as a security measure. To be sure, Oses ultimately proved a demonstrative and disorderly participant in

the trial proceedings. But his subsequent misbehavior—which appears to have been in part a response to his perception of unfairness by the trial judge in administering the proceedings—does not provide *post hoc* justification for holding conferences outside the petitioner's presence.

Well before the trial of this case, the SJC had warned state trial judges "how inadequate is the procedure often followed in dealing with the issue of security at trial." *Commonwealth v. Brown,* 364 Mass. 471, 478, 305 N.E.2d 830 (1973). In *Brown,* the SJC held that in the absence of agreement among the prosecution, the defense, and the custodial authority regarding any unusual security measures that need to be taken during trial,

a judge who contemplates approving such measures should state his reasons (including recommendations received from the custodial authority) in the presence of counsel and defendant, and out of the presence of veniremen or jury, and provide an opportunity for counsel to make their objections known. If fact questions arise, they should be thrashed out. The hearing may be informal, and ordinary rules of admissibility need not be observed, but a record should be made.

*Id.* at 479, 305 N.E.2d 830.

The procedures required by *Brown* were not followed four years later when Oses was tried. Rather, the trial judge took the unusual step *sua sponte* of conducting discussions regarding the defendant's trial outside the presence of *the* person *Faretta* and *McKaskle* teach must retain actual control over the *pro se* defense. In light of *Brown,* no previously unarticulated security concern can now justify the exclusion of Oses from bench and lobby conferences.

---

**21.** While the respondent maintains that no "significant" issues were resolved during these conferences, the record reflects that a variety of trial issues were discussed, including evidentiary matters, availability of witnesses, security measures, and even the ability of the defendants properly to present their defense. These were "matters of importance" as contemplated by the *McKaskle* Court. *See, e.g.,* Tr. III, at 3 (availability of adequate number of jurors in jury panel); Tr. V, at 62 (motion for mistrial follow-

ing prosecutor's remark regarding gun exhibit made in presence of jury); Tr. VII, at 50 (impeachment of prosecution witness by prior convictions); Tr. VIII, at 31 (use of FBI wiretap recording as evidence of kidnapping and ransom demands); Tr. XII, at 3 (discussion of Oses's intent to call 102 witnesses in his defense); Tr. XIII, at 12 (judge's comment on defendants' inability to represent themselves: "This is absolutely the most ridiculous thing I have ever seen in my whole life.").

More importantly, in light of *Faretta* and *McKaskle* this departure from clearly delineated state practice involved a violation of the petitioner's federal constitutional rights. The exclusion of Oses under these circumstances was a "structural defect [ ] in the ... trial mechanism" which affected the "entire conduct of the trial from beginning to end." *Arizona v. Fulminante,* 111 S.Ct. at 1265. This defect, especially when considered in connection with other misconduct by the trial judge, constituted constitutionally impermissible error.

### b. *Physical Restrictions on Mobility*

Other security measures employed from time to time by the trial judge to restrict Oses's courtroom movement were also inconsistent with constitutional principles of *pro se* representation. Indeed, it is apparent that Judge Chmielinski's conduct regarding security involved a wholesale disregard of *Brown*'s teachings. Oses's trial is ironically the paradigm which earlier led the SJC to develop explicit security measure procedures. The description of the problem in *Brown* accurately describes the proceeding against Oses:

> [T]he case well illustrates how inadequate is the procedure often followed in dealing with the issue of security at trial. The trial judge perceives the security problem or is somehow advised of it. He consults privately with the sheriff and makes his decision. There is perhaps a motion by defence counsel at some stage which the judge laconically denies. When the point is later pressed, whether on appeal or by collateral attack, there are available neither the reasons of the judge nor the facts supporting the reasons. Attempts to reconstruct the facts and the reasons are unsatisfactory, for time erodes evidence and memory. Further, and quite apart from the difficulties in reviewing the trial judge's decision, we can surmise that action, taken by a trial judge without any obligation to state his reasons to others or even to himself, will

be less perspicacious than action that he has to justify in some articulate and objective way.... [H]ad he been under a duty to give reasons and respond to possible criticisms by counsel, he might have done differently and better.

364 Mass. at 478, 305 N.E.2d 830.

From all that appears in the record, the decision to use shackles to restrain Oses in the courtroom had its origins in a discussion of procedures to be used in connection with a view to be taken of the crime scene by the jurors. The prosecutor informed Judge Chmielinski of a prior escape and that "the sheriff [was] suspicious that there was an escape plot in connection with this case." Tr. II, at 5. The judge then abdicated his responsibility to the security forces:

> I don't think the question of security is one for my determination, really. The officers in charge are the ones responsible for the security of these defendants and I think I would much rather leave it to them because they are responsible for them, not the Court. So whatever measures they think are necessary, I think I will have to comply with because, as I say, it is their problem, not mine.

*Id.*

In response to a request by defense counsel that the Court "explain to the jury that [any such shackling] has no bearing on their guilt or innocence," *id.,* Judge Chmielinski replied, "Certainly, I will probably reiterate that four or five times in my charge." *Id.* at 5–6. Unfortunately, he did not provide a single iteration of the requested instruction.

▆▆ It is unclear from the record when physical restraints were actually imposed on Oses during the remainder of the trial.[22] References to the use of leg irons and handcuffs in the courtroom do not appear in the record from the time they were removed before voir dire until the period immediately following the gagging incident during

---

**22.** Certain restraints that are clear from the record are plainly within the discretion of the trial judge. The direction that questioning be done from counsel table or some other fixed location, for example, is a common and unre-

markable restriction imposed even upon lawyers in at least some trial sessions of both the Massachusetts Superior Court and, indeed, this court.

the cross-examination of Oses' mother. Whenever used, however, gagging and shackles require substantial justification. *See generally Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970) (observing that while "no person should be tried while shackled and gagged except as a last resort" nevertheless "in some situations which we need not attempt to foresee, binding and gagging might possibly be the fairest and most reasonable way to handle [an obstreperous and disorderly] defendant ...").

While a more complete record would assist in obtaining a more complete sense of whether the trial judge's approach to restraining Oses physically was, standing alone, "so inherently prejudicial that respondent was thereby denied his constitutional right to a fair trial," *Holbrook v. Flynn,* 475 U.S. 560, 570, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986), the concerns expressed by the Supreme Court in *Illinois v. Allen* are sufficient to frame the issue for present purposes:

> Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.

397 U.S. at 344, 90 S.Ct. at 1061.

Those insistent possibilities of jury prejudice and affront to the dignity and decorum of the judicial proceeding were realized here. Judge Chmielinski's limp cautionary instruction to the jury, the day after the courtroom disruption arising from the attempted gagging of Oses, to "disregard whatever happened yesterday", Tr. XVIII, at 27–28, could in the context of this case hardly have ameliorated the jury's questions about the defendant's presumptive innocence. This is particularly so when the judge failed to iterate, let alone "reiterate,"

as he suggested he would, cautionary instructions in his final charge to the jury. More specifically, Judge Chmielinski's decision to have a gag placed on the defendant was not a measure of last resort, but an expedient chosen without even a recess to see if the explosive situation could be defused. And it was followed by Judge Chmielinski's customary abdication to the sheriff on the question of shackling.[23] The trial judge's approach to physical restraints on the petitioner here did not reflect any careful concern to use—under judicial control and direction—the least restrictive means to maintain the dignity and decorum of the proceeding. When coupled with other aspects of the administration of the trial, Judge Chmielinski's mishandling of the security issues debilitated Oses' sixth amendment right to self-representation and infected the entire proceeding.

c. *The Trial Judge's Commentary.* It is beyond dispute that to preserve "dignity, order, and decorum ... trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Illinois v. Allen,* 397 U.S. at 343, 90 S.Ct. at 1061, 25 L.Ed.2d 353. But Judge Chmielinski's actions went beyond any reasonable bounds of maintaining control; instead of preserving the ideal of dignity, order, and decorum, his gratuitously sarcastic remarks served to destroy it. From the jury's perspective, the trial judge's actions could only be interpreted as a wholesale judicial rejection of the validity of Oses's *pro se* defense.

The transcript is replete with verbal improprieties demeaning the *pro se* defense; I list here only a few particularly illustrative examples delivered in the presence of the jury.

—When called upon to use his peremptory challenges, Oses asserted, "Your Honor,

---

**23.** Judge Chmielinski was adamant about deferring completely to the security detail on the question of security arrangements.

> Now in the interest of safety, I am not going to make the determination at all as to security. I am going to leave that up to the sheriff's

department. If they in their opinion consider these two individuals as being safe, then that is up to them. It is a security matter, actually, and I am leaving it up to them.

Tr. XVIII, at 7.

I am being forced to pick these two challenges," Judge Chmielinski responded, "You are not forced to do a thing. You are proceeding pro se. Act like a lawyer if you want to be a lawyer." Tr. III, at 23–24.

—When Oses was cross-examining a witness about what he was doing at Oses' girlfriend's house, the judge interjected *sua sponte*, "Maybe she was cheating on you." Tr. VII, at 72.

—When Oses tried to justify his repetitious cross-examination of prosecution witnesses, the following exchange took place:

THE COURT: You are going around in a circle. You keep asking—

MR. OSES: Because I want to find out.

THE COURT: —the same questions.

MR. OSES: Because they don't answer me.

THE COURT: Will you please shut up.

MR. OSES: I am innocent, man.

THE COURT: We all understand that.

Tr. X, at 36.[24]

—When Oses attempted to have the judge instruct a police officer to look at him while testifying, and not the D.A., the judge said, "Maybe he doesn't want to look at you." Asked why not, the judge responded, "It's a matter of taste, I suppose." Tr. XIII, at 85–86.

—When Oses requested an instruction be given to an uncertain identification witness, Judge Chmielinski in colloquy with the defendant affirmed the identification of the petitioner.

MR. OSES: When he says he is not sure, can he be a little more specific?

THE COURT: If he is not sure, he can't be any more specific.

MR. OSES: He seen me so he had to see somebody else.

THE COURT: He is not sure who else he saw.

MR. OSES: He didn't see the important things.

THE COURT: What are the important things? He saw you.

Tr. XIV, at 48–49.

—When Oses objected to cross-examination of his mother on grounds that the prosecutor "is confusing my mother. My mother is a nervous woman," the judge retorted: "You have got me nervous, too. Sit down." Tr. XVII, at 70.

Despite the respondent's disingenuous characterizations of these remarks as "indecorous," "droll," and "conversational," their net result was to deny Oses the opportunity to be perceived as representing himself by the jury and to impugn the validity of his defense.

Quite apart from the merits of the instant petition, Judge Chmielinski's conduct of the *Oses* trial demonstrates the truth of Francis Bacon's observation that "an overspeaking judge is no well-tuned cymbal." F. Bacon, *Of Judicature* in The Essays of Francis Bacon 251, 254 (M.A. Scott ed. 1908). And his continual reach for what he no doubt believed to be snappy ripostes demonstrates why one of the most respected of Massachusetts state judges observed that the trial judge "must take care not to set a bad example by striving to be witty." H.T. Lummus, The Trial Judge 23 (1937). But more was involved here than an un-

---

**24.** The judge used slang expressions repeatedly when attempting to direct Oses to be quiet. *See, e.g.,* Tr. IX, at 47 ("When I am talking, will you kindly keep still. You have the biggest mouth I have ever seen in my life."); Tr. XVI, at 62 ("Shut up. You seem to have a chronic inability to keep that mouth shut."); Tr. XVI, at 66 ("In just about two minutes, you are going to get a gag in your mouth."). It is certainly true that Oses made inappropriate statements and asked improper questions during the trial; but that did not relieve the trial judge of the obligation to tailor his responses in order to protect the defendant's sixth amendment rights. And putting to one side the lack of judicial decorum manifest in the trial judge's repeated use of slang phrases to administer directions in the presence of the jury, it is apparent that the jury would discount much of what a petitioner was saying when the judge was constantly instructing the defendant to shut up. "It is a matter of common knowledge that jurors hang tenaciously upon remarks made by the court during the progress of the trial, and if, perchance, they are enabled to discover the views of the court regarding the effect of a witness' testimony or the merits of the case, they almost invariably follow them." *State v. Philpot,* 97 Iowa 365, 66 N.W. 730, 732 (1896).

seemly judicial burlesque competition between an overspeaking judge and an obstreperous litigant.

Judge Chmielinski's conduct was in clear and continuous contravention of a benchmark for the function of a trial judge described as "obvious" when the American Bar Association adopted its Standards for Criminal Justice in 1971. ABA Criminal Justice Standards Relating to the Function of the Trial Judge § 6.4 ("Judge's responsibility for self-restraint").[25] That standard provides:

> The trial judge should be the exemplar of dignity and impartiality. He should exercise restraint over his conduct and utterances. He should suppress his personal predilections, and control his temper and emotions. He should not permit any person in the courtroom to embroil him in conflict, and he should otherwise avoid conduct on his part which tends to demean the proceedings or to undermine his authority in the courtroom. When it becomes necessary during the trial for him to comment upon the conduct of witnesses, spectators, counsel or others, or upon the testimony, he should do so in a firm, dignified and restrained manner, avoiding repartee, limiting his comments and rulings to what is reasonably required for the orderly progress of the trial, and refraining from unnecessary disparagement of persons or issues.

Judge Chmielinski met none of these responsibilities[26] in his conduct of the petitioner's trial. And that failure is a matter of constitutional concern.

The repetitive quality and substantive character of Judge Chmielinski's commentary drove home a clear message to the jury—and indeed all exposed to the trial proceedings: the trial judge was not impartial. Judge Chmielinski's commentary served to deliver explicitly what the arrangements for security demonstrated implicitly: that the trial judge had determined—before the evidence was closed and the jury's verdict returned—that the petitioner was guilty, and that the manner and substance of his defense was unworthy of either respect or belief.

d. *The Prosecutor's Commentary.* Perhaps encouraged by the behavior of the judge—and certainly not restrained by the judge's example—the prosecutor in this case also made certain improper remarks about Oses and his defense in the presence of the jury. Although hardly praiseworthy, the prosecutor's commentary was not, unfortunately, very different from what sometimes passes between adversaries during a long and hotly contested trial over which the trial judge exercises no effective control. Yet even conceding that the prosecutor's actions were not standing alone violative of the petitioner's constitutional rights, *cf. United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), that conduct also did not occur in a vacuum. In the context of this case, that conduct served to reinforce the unfairness of the trial judge's misconduct in demeaning the defendant.

An instructive example of this tendency to reinforce the unfairness of the proceeding can be found in the scenario acted out in connection with the introduction of a gun into evidence. The prosecutor called upon Lieutenant Cummings in the presence of the jury to secure the weapon by placing a

---

**25.** This standard was reaffirmed with only stylistic changes when a second edition of the Criminal Justice standards was adopted by the ABA in 1980. ABA Criminal Justice Standards, Special Function of the Trial Judge, Standard 6–3.4 (2d. ed. 1982).

**26.** While the ABA standard provides the basic responsibilities in this regard, the larger aspiration was set forth eloquently by Chief Justice Hennessey in a tribute to a model Massachusetts trial judge who ultimately served on the SJC.

> The proper administration of American justice is a fine art ... the efforts of all can reach no higher than the personality of the judge permits. Perfection, if the judge seeks it, requires unfailing courtesy, without sacrifice of firmness and decisiveness; evenhandedness, while retaining a jealous regard for the individuality of every person; restraint, eternal restraint, particularly as to both the quality and the quantity of speech. Above all, integrity in all its nuances.

*Memorial to the Late Justice Paul Grattan Kirk,* 385 Mass. 1217, 1240–41 (1982) (comments of Chief Justice Hennessey).

guard on the trigger and trigger housing "to make that gun inoperative." Tr. V, at 61. The gun had obviously been in the prosecutor's possession before its introduction in evidence. A request to "secure" the weapon in front of the jury subliminally encourages juror perception of a defendant as a dangerous individual. Securing the weapon before the jury under these circumstance unfairly exacerbated the prejudicial effect on the jury of the trial judge's security measures and commentary, further reinforcing the perception that the petitioner was a dangerous figure. It is the responsibility of the trial judge to insure that such melodramatic maneuvers by trial counsel be eliminated or sanctioned. "[T]he trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; 'the judge is not a mere moderator but is the governor of the trial for the purpose of assuring its proper conduct.'" *United States v. Young,* 470 U.S. at 10, 105 S.Ct. at 1043–44 (quoting *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 698, 77 L.Ed. 1321 (1933)).

### e. Conclusion

Under *McKaskle,* the defendant must be accorded the appearance of one conducting his own defense in a manner that "affirm[s] the accused's individual dignity and autonomy." 465 U.S. at 178, 104 S.Ct. at 951. As the record reflects, Oses was not accorded this appearance, and that is a violation of his sixth amendment right to self-representation. Because the person charged with maintaining dignity and decorum was in large part responsible for this

failure, the violation was particularly egregious.[27]

### (2) The Comment on Whether Oses Would Testify

Oses also claims unconstitutional trial conduct in violation of his fifth and fourteenth amendment rights arising from the trial judge's improper comment suggesting Oses would testify on his own behalf. Oses did not, in fact, testify at the trial.

During his cross-examination of Captain Fleming of the Brookline Police Department, Oses attempted to base some of his questions on a photograph that had been marked as an exhibit. The following exchange ensued:

MR. OSES: Excuse me, Your Honor. I would also like to show the jury that big photo here indicating where Mr. Fleming says Mr. Fernandes and Mr. Shepard allegedly was laying ... and I would also like to indicate that there is no evidence showing that them two men were laying there. They were laying some place else. May I bring this so the jury can see this?

THE COURT: Let me see that. There is nothing here to indicate where anybody was lying.

MR. OSES: That's right. I was going to show them the spots where they was laying in the photos.

THE COURT: You can do that when you testify, I suppose.

Tr. XI, at 95.

No doubt sensing the prospect of appellate reversal, the prosecutor asked to approach the bench and requested the judge to instruct the jury that Oses was under no

---

27. It is apparent that Judge Chmielinski was assertively unsympathetic to the purposes and practices required by *Faretta* for *pro se* criminal trials. Barely nine months before the *Oses* trial began, a conviction obtained before Judge Chmielinski was reversed with pointed language as a result of his rush to judgment and consequent failure to treat the problem of *pro se* representation with the required care and sensitivity. *See Commonwealth v. Cavanaugh,* 371 Mass. 46, 353 N.E.2d 732 (1976). Yet his resistance to accepting—and conforming his conduct to—governing sixth amendment case law remained undiminished throughout the *Oses* trial. Reflecting with counsel—in the absence of Oses, as was his custom—about the way in which the

trial was proceeding, Judge Chmielinski observed in the middle of trial:

You see, again, we are faced with the same situation I have been complaining about since I have been here, this business of allowing people to represent themselves without any finding by the Court that they are capable of doing so. This is absolutely the most ridiculous thing I have ever seen in my whole life. I don't know what the appellate judges are thinking of when they make these rulings. Obviously, they are not confronted with the situation we have right now but this is a good example of what can happen.

Tr. XIII, at 12–13.

obligation to testify. *Id.* at 96. Judge Chmielinski then informed the jury, "Ladies and gentlemen, I said Mr. Oses could use this last photograph which we marked for identification when he testified. I should have qualified that by saying that if he chose to testify, he could then use the photograph. There is no obligation for him to testify." *Id.* Oses argues that these remarks by the judge both highlighted his decision not to testify and constituted an adverse comment upon that decision.

It is a core concern of the fifth amendment that neither the prosecutor nor the court comment upon an accused's failure to testify. *Griffin v. California,* 380 U.S. 609, 614–15, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965). To determine whether such an improper comment has been made, the First Circuit looks to "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Ferreira v. Fair,* 732 F.2d 245, 249 (1st Cir.), *cert. denied,* 469 U.S. 1017, 105 S.Ct. 430, 83 L.Ed.2d 356 (1984); *United States v. Flaherty,* 668 F.2d 566, 599 (1st Cir.1981). Even those comments which do fit this description, however, may be rendered "harmless" by an immediate and forceful curative instruction from the judge. *Lussier v. Gunter,* 552 F.2d 385, 389 & n. 2 (1st Cir.), *cert. denied,* 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 124 (1977). *See Carter v. Kentucky,* 450 U.S. 288, 300, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981) (fifth amendment requires criminal trial judge to give "no-adverse-inference" jury instruction when requested by a defendant to do so following comment upon defendant's silence).

It would be difficult for the jury to interpret Judge Chmielinski's initial remark as anything but a comment on Oses's need to testify in order to impeach the credibility of Captain Fleming's testimony. The contemporaneous curative instruction, given only at the behest of the prosecutor, was pedestrian at best, and failed to specify that no

adverse inference should be drawn from a decision by Oses not to testify. The remark, in the context of the other commentary by Judge Chmielinski throughout the trial, contributed further to the denial to Oses of a fair trial.

Of course, the defendant made no objection at the time of this remark, nor was it he who requested the curative instruction. And regardless of who requested the instruction, the jurors were told at the time that Oses was under no obligation to testify. In addition, during his instructions to the jury at the end of the trial[28] Judge Chmielinski did emphasize that point *and* the fact that no adverse inferences should be drawn from the defendants' decision not to testify. Moreover, he cautioned the jury that statements made by the defendants implicating them in other criminal activities were not evidence and should not be held against the defendants as to their guilt or innocence for the crimes charged.[29] Standing alone, it is unlikely that the offensive comment by Judge Chmielinski would in the ordinary case constitute a plain fifth amendment violation.

Nevertheless, in these particular circumstances, Judge Chmielinski's comment drawing into question Oses's fifth amendment right not to testify was more harmful precisely because the petitioner was exercising his sixth amendment right of self-representation in his examination of the witness. And, therefore, despite the fact that the curative instruction and the later concluding jury instructions mitigated its direct impact, taken in conjunction with the other improper commentary made by the judge, this commentary further undermined Oses's ability—and perhaps more importantly the perception of the propriety of his decision—to represent himself and contributed to the violation of his sixth amendment rights under *Faretta* and *McKaskle.*

(3) The Failure of the Trial Judge

It does not overstate the role of the trial judge to observe, as Learned Hand once did, that "[j]ustice does not depend upon legal dialectics so much as upon the atmosphere of the court room, and that in the end depends primarily upon the judge."

---

**28.** See Tr. XXIII, at 6, 11, 14, and 28.

**29.** See Tr. XXIII, at 14–15, 28.

*Brown v. Walter*, 62 F.2d 798, 800 (2d Cir.1933). *See generally* Note, *The Appearance of Justice: Judges' Verbal and Nonverbal Behavior in Criminal Jury Trials*, 38 Stan.L.Rev. 89, 92–101 (1985). The trial judge in this case polluted the atmosphere with his own actions and his inability properly to control the actions of the other trial participants.

Because this was a case tried *pro se* by the petitioner, the failures of the trial judge here reverberated constitutional error depriving the petitioner of sixth amendment rights. But the trial judge's failure went beyond plain sixth amendment violation. This was a case in which the admitted lack of control exercised by Judge Chmielinski "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. De-Christoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

### C. *The Reasonable Doubt Instruction*

██ Finally, Oses argues that he was denied due process by the judge's charge to the jury on reasonable doubt, because the charge both lessened the state's burden of proof and improperly shifted that burden to the defendant. The entire text of the judge's charge on the definition of reasonable doubt is reproduced in the margin below.[30] According to Oses, Judge Chmie-linski improperly attempted to quantify reasonable doubt both by stating that, "certainly, in every case, there is some doubt, some small doubt. What we are concerned with here, though, is reasonable doubt ...," and by stating, "[t]he Commonwealth is not required to prove its case to a mathematical certainty." Each of these instructions, argues Oses, created a risk that the jury could find guilt upon a level of proof below that constitutionally required.

Oses is correct that the Due Process Clause of the Constitution guarantees an accused that he or she will not be convicted except upon proof of each element of the offense charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). On habeas corpus review, the question for this court is "whether the impropriety [of the charge at issue] actually infected the entire trial and rendered petitioner's conviction violative of constitutional due process." *Smith v. Butler*, 696 F.Supp. 748, 759 (D.Mass.1988), *aff'd* 879 F.2d 853 (1st Cir.) (table), *cert. denied* 493 U.S. 895, 110 S.Ct. 245, 107 L.Ed.2d 196 (1989); *see also Bumpus v. Gunter*, 635 F.2d 907, 913 (1st Cir.1980), *cert. denied,* 450 U.S. 1003, 101 S.Ct. 1714, 68 L.Ed.2d 207 (1981) (question of whether "imperfections in the instant jury charge were ... of such magnitude as

---

**30.** The reasonable doubt instruction provided:
"Now, what is a reasonable doubt? That one phrase perhaps has been the subject of more legal writing than any other that I know of in the criminal law. I am going to quote a passage from a famous case decided over 120 years ago in Massachusetts entitled Commonwealth versus Webster in which a judge, who was extremely learned, defined in that case the term reasonable doubt. And he said as follows:
"'Then what is reasonable doubt? It is a term often used, probably pretty well understood, but not easily defined.
"'It is not mere possible doubt because everything relating to human affairs and depending upon oral evidence is open to some possible or imaginary doubt.
"'It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say that they feel an abiding conviction to a moral certainty of the truth of the charge.
"'The burden of proof is upon the prosecutor. All the presumptions of law independent of evidence are in favor of innocence and every person is presumed to be innocent until he is proved guilty. If upon such proof there is a reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal, for it is not sufficient to establish a probability, though a strong one, arising from the doctrine of chances that the fact charged is more likely to be true than the contrary, but the evidence must establish the truth of the fact to a reasonable and moral certainty, a certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it.'
"Now, that, perhaps is said as concisely and succinctly as anyone could possibly say it.
"The Commonwealth is not required to prove its case to a mathematical certainty because that would be impossible. There is no set of facts outside of a mathematical theorem, perhaps, that can be proved with mathematical certainty. And, certainly, in every case, there is some doubt, some small doubt. What we are concerned with here, though, is reasonable doubt, as I have just explained to you quoting from the famous case of Commonwealth versus Webster."
Tr. XXIII, at 6–9.

to have deprived petitioner of his basic right to be tried and convicted only under the standard of 'proof beyond a reasonable doubt' "). In making such an evaluation, the Supreme Court has cautioned that a single instruction cannot "be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Commonwealth v. A Juvenile (No. 2),* 396 Mass. 215, 218–19, 485 N.E.2d 170 (1985).

The instruction given by Judge Chmielinski in this case, when read as a whole, was constitutionally adequate. Almost all of the language employed by the judge came directly from *Commonwealth v. Webster,* which has been the standard of reasonable doubt in the Commonwealth for over one hundred years. *See Smith v. Butler,* 696 F.Supp. at 754 & n. 9 (reasonable doubt language of *Commonwealth v. Webster* "seems to have something approaching a talismanic effect in the Massachusetts state courts, saving otherwise problematic jury instructions from causing reversals of criminal convictions," despite explicit disapproval of its moral certainty language by the federal courts). The additional language Judge Chmielinski added regarding the impossibility of proving anything "to a mathematical certainty" is not significantly different from the language of the *Webster* charge itself that "everything relating to human affairs and depending upon oral evidence is open to some possible or imaginary doubt." It is unlikely that this language would have caused the jury to hold the Commonwealth to a lesser standard than reasonable doubt.

■ Similarly, while the words "small doubt" are somewhat more of a departure from the language of *Webster,* they are not enough to deprive the definition of reasonable doubt of its "critical constitutional mass." *See Smith v. Butler,* 696 F.Supp. at 766. Before giving the jury the *Webster* charge, the judge instructed them in strong language that the defendants were presumed innocent and the entire burden of proving their guilt lay with the Commonwealth; that the defendants had no obligation to prove their innocence or take the stand ("and I am instructing you as a matter of law that you cannot hold that against them"); and that the burden of proof that the Commonwealth had to meet was proof beyond a reasonable doubt. Following the reasonable doubt definition, the judge repeated on three separate occasions that the entire burden of proof was upon the Commonwealth, twice reiterating that that burden could only be met by proof of all the elements beyond a reasonable doubt. And at two different points, the judge advised the jury that their determinations of innocence or guilt were "extremely important" to the defendants, the prosecution, and all citizens of the Commonwealth.

This is not a case where the majority of the charge consisted of inappropriate or misleading language. *Cf. Lanigan v. Maloney,* 853 F.2d 40, 48 (1st Cir.1988) ("entire thrust of reasonable doubt charge was to de-emphasize the strength of what is supposed to be a very strong standard, potentially depriving petitioner of perhaps his most important protection against an improper verdict"); *Dunn v. Perrin,* 570 F.2d 21, 25 (1st Cir.1978) (cumulative effect of three erroneous definitions of reasonable doubt "was to obfuscate one of the 'essentials of due process and fair treatment' "). The words "small doubt" were not the most helpful that could have been chosen to distinguish reasonable doubt from absolute certainty. Viewed as a whole, however, the judge's charge on the Commonwealth's burden of proof was fairly forceful, and there does not appear to be any significant risk that the jury applied a lesser standard than that to which Oses was constitutionally entitled.

### IV.

It is a daunting prospect to confront a record which requires that a new trial be ordered or the defendant go free over 14 years after the original flawed trial was concluded. This is particularly so when, as here, the crime was horrific and the evidence of guilt substantial. The unsettling prospect of entering such an order was plainly a matter of institutional concern for the Massachusetts Appeals Court. In its unpublished memorandum, that court observed:

We must expect that, if we were to order a new trial, there probably would be great difficulty in finding witnesses who testified in 1977. Witnesses, indeed, would be likely to have greatly diminished recollection of events over a decade ago.

Appendix A at 473.

And I am acutely aware that the review of trial court proceedings on a written record does not provide the full flavor of the nisi prius environment. As a consequence, reviewing courts in direct appeal and collateral attack have accorded substantial deference to the trial judge's more informed and sensitized response to the control of proceedings before him. Moreover, not every mistake at the trial level assumes constitutional dimensions.

Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded:

"In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution." *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).

*United States v. Young*, 470 U.S. at 16, 105 S.Ct. at 1046–47.

Those institutional concerns are intensified when the vehicle for ordering a new state trial is a federal writ of habeas corpus. The United States Supreme Court has been emphatic in reiterating that "[w]e remain convinced that the burden of justifying federal habeas corpus relief for state prisoners is 'greater than the showing required to establish plain error on direct appeal.'" *Engle v. Isaac*, 456 U.S. 107, 134–35, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783 (1982) (citations omitted).

Fully cognizant of such institutional concerns and constraints, I have read and re-read this record in an effort to "relive the whole trial imaginatively" and to see if it is possible to conclude, as did the Massachusetts Appeals Court, that "[t]he trial was handled about as well as could be done in the circumstances." Appendix A at 473. I have determined that one can reach such a conclusion only by systematically ignoring the wholesale failure of the trial judge to exercise his responsibilities. This was a proceeding without proper control, and not least among the participants who were out of control was Judge Chmielinski. Provisions for the federal writ of habeas corpus would be hollow if a proceeding such as this trial of the petitioner were permitted to stand. When, as here, the trial judge consistently undermines the teachings of *Faretta* and by his conduct infects the trial with fundamental unfairness, the writ is required irrespective of the consequences. The errors were plain and only by an act of willful blindness can they be treated as harmless. The trial of Thomas Oses violated his rights under the fifth, sixth and fourteenth amendments to the United States Constitution.

Accordingly, the writ of habeas corpus shall issue unless, within 90 days from the date of this order, the respondent has reinstituted proceedings to retry the petitioner. Pending such further proceedings the petitioner shall not be enlarged on bail, unless otherwise ordered by some other court having jurisdiction over this matter.

### APPENDIX A

### COMMONWEALTH OF MASSACHUSETTS

### APPEALS COURT

Commonwealth

vs.

Thomas Oses.

No. 88–P–191

### MEMORANDUM AND ORDER UNDER RULE 1:28 [1]

*Background Procedure*

Oses, then nineteen years old (A. 35), and a codefendant, William Sheppard (not a

---

1. References to the record appendix attached to Oses's brief, are marked "A." and those to the

party to this appeal), were each indicted on January 11, 1977, for kidnapping and armed assault in a dwelling. Each defendant, in circumstances described below, insisted on representing himself at trial. A "stand-by counsel" was designated to assist each defendant.

After a trial lasting about a month, the jury returned on July 8, 1977, a verdict of guilty of the offense alleged in each indictment against Oses. Oses was sentenced to life imprisonment at M.C.I., Cedar Junction (then Walpole), on the charge of armed assault in a dwelling with a dangerous weapon and from twelve to twenty years imprisonment on the indictment for kidnapping. These sentences originally were to be served consecutively, but were modified by the Appellate Division of the Superior Court on November 17, 1977, by an order that the two sentences be served concurrently.

Appellate counsel (who entered his appearance on July 27, 1987, A. 15) for Oses now raises and argues essentially the following principal issues. See Oses's brief at 1–2. (1) Was it error for a judge of the Superior Court (Judge No. 1) to refuse Oses's request for a three month's continuance to allow new private counsel to enter the case which the Commonwealth was anxious to try promptly? (2) Where Oses asked for leave to defend himself, was it (in the circumstances revealed by this record) error for Judge No. 1 to accept Oses's signed waiver of counsel after strongly warning him that to do so would be seriously unwise and disadvantageous? (3) Was the conduct of another Superior Court judge (Judge No. 2) who presided at the trial in various respects erroneous and prejudicial to Oses? We hold that Judge No. 1 acted well within the range of his discretion, despite the judge's obvious doubts about Oses's capacity to defend himself. We examine the record to determine whether Judge No. 2 erred significantly (to Oses's prejudice) in controlling the conduct of the trial.

Much evidence at trial described extremely serious crimes. That evidence, permitted the jury, if they found it credible, to conclude as to the kidnapping charge that Oses participated in the events summarized in the margin.[2] The defendants were apprehended by Brookline police officers and by agents of the Federal Bureau of Investigation (F.B.I.) at the apartment of the victim's parents. Testimony about the defendants' entry of that apartment (armed with a pistol and a knife) permitted the jury to find the circumstances summarized below.[3]

The indictments alleged (A. 3, 15) that the kidnapping took place on December 26,

Commonwealth's supplemental appendix are marked "S.A." Pretrial transcripts are referred as "Tr." by an abbreviated date and page. Trial transcripts are noted as "Tr.," followed by volume and page references.

2. Testimony of the victim and others was to the effect that a young male diabetic (the victim) had been taken at gunpoint, held for about two days, without having his usual insulin, and then released. The victim arrived at a hospital "in a serious condition of . . . diabetes out of control." Tr. 5:82–88, 101. There was evidence also (a) that, while in captivity, the victim had been subjected to beatings and to being burned by matches near his genitals, and (b) that he had been compelled to transmit to his family by telephone statements about Oses's ransom demands for his release.

3. The victim's family (upon receiving telephone reports of the threats by Oses against his safety and demands for a ransom) had consulted the F.B.I. and the Brookline police. Oses and Sheppard, it was testified, had gone to the family apartment to attempt to negotiate a ransom. When the police entered, a conflict took place during which the victim's father was killed by a bullet fired by an arresting officer. Oses was not charged with that killing. His codefendant was seriously wounded and was hospitalized for some weeks. See Tr. 5/9/77, at 11. Oses attempted to prove that he was elsewhere when the alleged kidnapping took place and that the victim's brother Ivan had been engaged in various activities which in some manner had led indirectly to the affray at the family apartment.

1976. Oses was at first represented by retained counsel, Mr. Melvin Levine, who entered his appearance on February 1, 1977. A. 3, 15. See Tr. 5/9/77, at 16. Oses's codefendant, Sheppard, was then represented by appointed counsel, Mr. Martin Gideonse. *Ibid.* The two defense counsel had filed various motions and conducted negotiations for discovery during the period before May 9, 1977. On that day defense counsel presented before a Superior Court judge (Judge No. 1) motions to withdraw from the case. Tr. 5/9/77, at 3–4. It then was represented to the judge (during a general discussion by counsel for both defendants, by both defendants, and by the prosecutor, without any explicit motion for a continuance) that Oses had retained Mr. Frank Kelleher (*id.* at 4–7) to appear for him in the single justice session of the Supreme Judicial Court on the matter of bail reduction only. An office associate of Mr. Kelleher, present on May 9, told that judge that Mr. Kelleher would only appear for Oses at trial if given a three month continuance until September to prepare for Oses's defense. See *id.* at 7.

Oses then inquired of Judge No. 1, whether he and his codefendant could represent themselves with Mr. Levine and Mr. Gideonse remaining in the case as co-counsel. During the hearing, which Judge No. 1 adjourned for two days (in order to study the papers), the judge (*id.* at 32–36) advised the defendants in strong terms that they had competent counsel and were not "thinking very straight" in going "to trial without benefit of counsel." *Id.* at 35. The defendants on May 9 indicated that they wanted a speedy trial to begin on June 6. *Id.* at 32–40. The judge was entitled to take Oses at his word on this, although (perhaps because of Oses's dissatisfaction with his then retained attorney, *id.* at 36) the request for a speedy trial was inconsist-

ent with any proposal for a three month continuance to obtain Mr. Kelleher's services.

On May 11, at a resumed hearing, Judge No. 1 (Tr. 5/11/77, at 16–26, 35–45) pointed out to the defendants once more the serious risks to them of self-representation the pending prosecution. Oses (A. 4, 16) signed a waiver of counsel "limited to trial in the Superior Court." S.A. 2–3; Tr. 5/11/77, at 42–44. The case again was continued until May 19 for a determination of the date of trial. *Id.* at 43–48. Judge No. 1 then again referred to the dangers of self-representation. Tr. 5/19/77, at 6. At that hearing (*id.* at 12, *et seq.*), it was ordered that trial commence on June 6.[4]

We conclude that Judge No. 1 acted well within the range of his broad discretion in failing to give Oses a continuance in order to obtain other retained counsel who would be available only after a three month delay to try a very serious case which the Commonwealth properly wanted to bring to trial promptly. *Commonwealth v. Appleby*, 389 Mass. 359, 370–371 [450 N.E.2d 1070] (1983).

Judge No. 1 more than adequately, on at least May 9 and 11 (and to some extent on May 19), warned Oses and his codefendant of the serious risks they were running in representing themselves. Judge No. 1 was justified in the circumstances (compare *Commonwealth v. Cavanaugh*, 371 Mass. 46, 52–54 [353 N.E.2d 732] [1976]) in regarding Oses's signed waiver of counsel, in the light of Oses's insistence on representing himself, as voluntary. Indeed, the right of a criminal defendant to defend himself had been established by the Supreme Court of the United States in *Faretta v. California*, 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (1975), only about two years earlier than Judge No. 1's decision.[5]

---

**4.** On the first day of trial before Judge No. 2, Mr. Frank Kelleher, who (as stated above) had represented Oses on a reduction of bail application, appeared and represented that he thought Oses was indigent and in no position to retain counsel. Tr. 1:34–39. See Oses's admission that he had no money to pay Mr. Kelleher or Mr. Levine. Tr. 1:12–13. Mr. Kelleher was excused

by Judge No. 2 from further participation in the case upon his assurance that he was "not attorney of record" and that he had no desire to be Oses's attorney at trial or to be appointed to assist Oses at trial. Mr. Kelleher never entered an appearance in the case.

**5.** Although the docket (A. 13) shows no appeal from the denial of a new trial on March 7, 1986,

On June 6, 1977, the case went to trial before judge No. 2, who has died since the trial. On that day, Judge No. 2 acted on various motions filed by Oses (Tr. 1:4, *et seq.*), denying some and granting others. He authorized Oses to have his handcuffs removed in court but denied a motion by Oses to have freedom of motion during cross-examination of witnesses (Docket item 47; A. 20, and also A. 7) and also a motion (Docket item 48; A. 20, and also A. 7) that he be allowed to be present at lobby and bench conferences. Oses saved an exception to each such denial of a motion. See Tr. 2:12.[6]

Oses's behavior in court at trial soon (e.g., Tr. 3:23–27) proved that he had been seriously unwise to attempt to represent himself. Even with the assistance of Mr. Levine, his "standby counsel" (whose help on occasion was objected to by Oses), Oses became entangled in difficulties. He filed an excessive number of repetitious motions and demands for discovery of material already furnished to his counsel. He (either from inexperience or deliberately) conducted unduly long cross-examination of witnesses, mixing improper statements of unproved facts with his questions. He proposed at times to call an excessive number of defense witnesses. See, e.g., Tr. 12:3.

The trial judge tried to exercise reasonable patience in dealing with Oses's actions and even made certain allowances for Oses's disregard of proper procedures (see, e.g., a continuance to enable Oses to find some witnesses, Tr. 15:52–53). There, however, were occasions when Oses's inappropriate behavior (and the resulting frustration of the judge at Oses's unpredictable actions, see, e.g., Tr. 6/21/77 at 7–20) led to admonitions and other statements and actions in the presence of the jury which Oses now asserts were prejudicial to him. We consider these, giving special attention to the effect of Judge No. 2's rulings (already mentioned) that Oses could not participate directly in bench and lobby conferences.

### Conduct of the Trial

The transcript shows the type of confusion into which a criminal trial may fall where a defendant representing himself fails to adhere (as well as he can) to usual court procedures and principles. The present case thus lends support to the predictions of the three dissenting justices in the *Faretta* case, 422 U.S. at 846–852 [95 S.Ct. at 2546–49], about the difficulties which that decision might cause, despite the contrary prophecy of the majority opinion (at 834 [95 S.Ct. at 2540]).[7]

Further guidance as to the situation where defendants choose to defend themselves was given in *McKaskle v. Wiggins,*

by a third Superior Court judge (S.A. 4–8), that denial was proper on the issues then presented.

**6.** The issues concerning bench and lobby conferences and freedom of movement about the court room were renewed in effect by Oses (during empanelment of the jury in the presence of at least some potential jurors). See Tr. 3:20–27. During this part of the proceedings, Oses properly was sentenced, immediately upon its occurrence, for contemptuous insolence to the judge. Tr. 3:23–24. Later (in the absence of any potential jurors) the issues were discussed further with appropriate warnings to the defendants.

**7.** In the *Faretta* case, 422 U.S. at 834, note 46 [95 S.Ct. at 2541, note 46] reads (in part): "We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized ... by federal law and by most of the States, and no

such result has thereby occurred. Moreover, the trial judge *may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.* See *Illinois v. Allen,* 397 U.S. 337 [90 S.Ct. 1057, 25 L.Ed.2d 353] [1970]. Of course, a State may ... appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. See *United States v. Dougherty,* ... 473 F.2d 1113, 1124–1126 [D.C.Cir.1972]." The *Faretta* opinion continues: "The right of self-representation *is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law.* Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel'" (emphasis supplied).

465 U.S. 168 [104 S.Ct. 944, 79 L.Ed.2d 122] (1984), where a majority of the Supreme Court determined (at 178–188) that standby counsel had not interfered unduly with a defendant's right under the *Faretta* case "to preserve actual control over the case he chooses to present to the jury" (see 465 U.S. at 178 [104 S.Ct. at 951]) or, "without the defendant's consent[,] ... to destroy the jury's perception that the defendant is representing himself." [8]

The recent Massachusetts cases dealing with self-representation by criminal defendants do not closely resemble the present case. In most of them, the problems of self representation at trial did not become a

controlling issue.[9] See also *Commonwealth v. Mott*, 2 Mass.App.Ct. 47, 49–52 [308 N.E.2d 557] (1974), where the pertinent cases were reviewed.[10]

An important problem is raised by Judge No. 2's denial to Oses and his codefendant of the opportunity to participate in bench conferences or conferences in chambers. At those discussions Oses, necessarily represented by his standby counsel, could not obtain before the jury whatever advantage (see the *McKaskle* case, 465 U.S. at 184, note 8 [104 S.Ct. at 954, note 8], *supra*) there was in being perceived to be defending himself. Although eventually Oses knew what had gone on at these conferences,[11] Judge No. 2's statement (Tr. 2:12)

**8.** The opinion of Justice O'Connor in the *McKaskle* case placed emphasis on this aspect ([465 U.S.] at 178–179 [104 S.Ct. at 951], case citations omitted) of the rights given by the *Faretta* case: "The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy. In related contexts the courts have recognized that a defendant has a right to be present at all important stages of trial, ... that he may not normally be forced to appear in court in shackles or prison garb, ... and that he has a right to present testimony in his own behalf.... Appearing before the jury in the status of one who is defending himself may be equally important to the pro se defendant." The *McKaskle* case (465 U.S. at 184 [104 S.Ct. at 954]) expressly recognized, however, that there was no constitutional requirement for "judges to take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course."

**9.** In *Commonwealth v. Lee*, 394 Mass. 209, 210 [475 N.E.2d 363] (1985), appointed counsel (theretofore appointed as standby counsel) "[e]arly in the presentation of the Commonwealth's case ... assumed the role of defense counsel" and acted for the defendant throughout the trial and through sentencing proceedings. In *Commonwealth v. Appleby*, 389 Mass. at 366–367 [450 N.E.2d 1070], there was no objection by that defendant to what standby counsel was doing as was present in the case before us and the opinion (at 366) made note that the trial judge had said before trial that the then defendant "had the right to conduct his own defense" but that his attorney "was in the case for all purposes" as of a specified date "and, rather than being a passive adviser, ... [he] would be expected to make suggestions for the conduct of trial as though he were partici-

pating in it as counsel." Cases recently decided, citing the *McKaskle* case (465 U.S. 168 [104 S.Ct. 944]), include *Commonwealth v. Tuitt*, 393 Mass. 801, 806–808 and see 815–818 [473 N.E.2d 1103] (1985), *Commonwealth v. Stovall*, 22 Mass.App.Ct. 737, 743 [498 N.E.2d 126] (1986), and *Commonwealth v. Aldrich*, 23 Mass.App.Ct. 157, 167 [499 N.E.2d 856] (1986). See, as to issues of security procedures in the courtroom, *Commonwealth v. Brown*, 364 Mass. 471, 473–480 [305 N.E.2d 830] (1973); *Commonwealth v. Cavanaugh*, 371 Mass. at 58 [353 N.E.2d 732]. See also *Commonwealth v. Stokes*, 11 Mass.App. Ct. 949, 950 [416 N.E.2d 1011] (1981).

**10.** In the *Mott* case ([2 Mass.App.Ct.] at 51 [308 N.E.2d 557]), special emphasis was placed on the language of art. 12 of the Declaration of Rights of the Constitution of the Commonwealth, which permits "every subject ... to be fully heard in his defence *by himself*, or his counsel, *at his election*" (emphasis supplied). See also *Commonwealth v. Chapman*, 8 Mass. App.Ct. 260, 265–268 [392 N.E.2d 1213] (1979).

**11.** The defendants were each furnished with stenographic transcripts of what was said at lobby and bench conferences. Oses might have gained something by being told directly by the judge, in the absence of the jury, what the judge thought of Oses's conduct, instead of being told indirectly by standby counsel. On occasion, the judge made his views clear directly, sometimes in the presence of the jury, and sometimes in their absence. The judge, of course, may have deprived himself by his ruling of one useful method of controlling (outside the presence of the jury) an inevitably difficult trial and a seriously misguided defendant. Examination of the transcript of bench and lobby conferences shows that they consisted largely of nonprejudicial, helpful efforts to induce standby counsel to instruct their clients how properly to make

that he did not "intend to have any lobby or bench conferences" was obviously a prediction impossible to achieve, as it soon appeared.

The defendants were required to be restrained at least by leg or ankle shackles. See, e.g., Tr. 18:26, 31–32; 19:4–5, 6. Compare Tr. 18:10. The trial judge was under obligation to take all reasonably necessary measures to preserve order in the courtroom, and his reasonable precautions in doing so, at least after suitable inquiry as to the necessity of the precautions, are a matter of his discretion, which he should not pass to the sheriff to exercise.[12] See *Commonwealth v. Brown*, 364 Mass. 471, 475–476 [305 N.E.2d 830] (1973). The judge, as suggested in the *Brown* case (at 476 [305 N.E.2d 830]), did "seek to quell [any resulting] prejudice by reasoning and warning [the jury] against it" the day following the most explosive incident (see Tr. 18:27–28) in the course of the trial.[13]

Oses's appellate counsel argues that other inappropriate comments or admonitions by the prosecutor (e.g., Tr. 8:124) or by the trial judge (see, e.g., Tr. 12:103–105) in the

presence of the jury were prejudicial to Oses. These comments and admonitions, in the course of a long trial, considered individually, probably would not lead us to order a new trial, despite the fact that some of them were demeaning, or sarcastic, or tended to ridicule Oses. See, e.g., Tr. 7:65–72, 12:67, 16:62, 66; 18:46–48; 19:46–48. Cumulatively, however, we recognize they may be of greater significance when viewed in connection with the judge's failure to permit Oses as a pro se defendant, to participate in bench and lobby conferences.[14]

We entertain no significant doubt, in the face of the very strong evidence presented by the Commonwealth (see notes 2 and 3, *supra*), that the verdicts would have been the same if the judge had permitted Oses to have complete participation in bench and lobby conferences. We also have no real doubt that the judge's unacceptable comments in the presence of the jury, in this long trial, were of little, if any, effect during their deliberations. We are also faced, as was the Supreme Court of the United States in *Illinois v. Allen*, 397 U.S. 337 [90 S.Ct. 1057, 25 L.Ed.2d 353] (1970, an appeal

inquiry of witnesses and otherwise to conform with usual trial practices.

**12.** The record indicates that the judge had been informed that Oses had an escape record and there may have been ground for apprehension of an escape attempt. The judge appropriately at least could have warned the jury in his charge to disregard any necessary restraints in deciding upon these defendants' guilt. See the *Brown* case, at 476 [305 N.E.2d 830]. We perceive no explicit warnings of this type in the final instructions. Tr. 23:5–36. In view of the *Brown* case, we would not order a new trial on the basis of the security restraints alone, although the judge presumably could have devised effective, but less restrictive, measures of preventing any escape or any risks to court personnel which would meet the standards of the *Brown* case.

**13.** While Oses's mother was under cross-examination by the prosecutor through a Spanish interpreter, Oses made continuous interruptions. Although the trial judge warned him to stop, Oses continued to interrupt. In the presence of the jury, court officers were directed to gag Oses. A disturbance ensued in which both defendants participated. Tr. 17:67–84. The judge (in the absence of the jury) denied motions by the defendants for a mistrial and

warned Oses against continuing to interrupt proceedings. Tr. 17:77.

**14.** The judge, in his charge, appropriately (Tr. 23:14) did instruct the jury that they should not pay any attention to Oses's implied admissions (in some questions asked of witnesses by him) that he had engaged in narcotics and other violations of law. The judge correctly pointed out to the jury that Oses was not being tried for such violations but only for the offenses charged in the indictments.

We need not discuss any possible impropriety in the judge's action (Tr. 1:39–40) in allowing an F.B.I. agent and a State police officer, later to be witnesses (see Tr. 14:18, 55), to sit at the counsel table with the prosecutor. No showing of any specific prejudice resulting from their presence has been made. It would have been within the discretion of the judge to deny all requests for segregation of the witnesses. *Commonwealth v. Jackson*, 384 Mass. 572, 581–582 [428 N.E.2d 289] (1981). In *United States v. Anagnos*, 853 F.2d 1, 4 (1st Cir.1988), relied on by Oses, because review en banc was granted, the judgment was vacated. That case is reported later to have become moot so that the opinion may be in process of withdrawal. It is reported that cases involving similar issues have recently been argued before the Supreme Judicial Court.

from events at a trial in 1957), with a case which has reached us long after the trial. The original appeal from this 1977 trial was not entered in this court until 1988. We do not attempt to decide how or where the responsibility for the delay arose.

We must expect that, if we were to order a new trial, there probably would be great difficulty in finding witnesses who testified in 1977. Witnesses, indeed, would be likely to have greatly diminished recollection of events over a decade ago. Many of the difficulties at trial arose from the efforts, against the advice of Judge No. 1, of a youth of nineteen to defend himself even with the assistance of competent and diligent standby counsel. There is also danger of applying to a 1977 trial standards announced in decisions since that date. For example, Justice O'Connor's opinion in the *McKaskle* case, 465 U.S. 168 [104 S.Ct. 944], which lays strong emphasis on the appearance of self-representation did not come down until 1984.

The *McKaskle* case made note (at 184 [104 S.Ct. at 954]) of the statement in the *Faretta* case, 422 U.S. at 834–835, note 4 [95 S.Ct. at 2540–41, note 4] (citing *Illinois v. Allen,* 397 U.S. 337 [90 S.Ct. 1057]). We must consider whether, in the circumstances, this is a case for application of the *Allen* case, where Justice Black said (at 343 [90 S.Ct. at 1061]), "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations."

What was done in Oses's case to control his behavior and to keep the trial within bounds must be examined in the light of the trial as a whole and the obvious difficulties confronting the trial judge growing out of Oses's self-representation. Much that was done in this case was far less severe and serious than the restraining actions approved in the *Allen* case at 344–347 [90 S.Ct. at 1061–62]. We recognize that the trial judge could have and should have acted with more patience and that some remarks in the presence of the jury were at least inappropriate. The judge, however, did not replace Oses by putting his standby counsel in charge but, probably wisely, permitted Oses to proceed on his chosen path. The trial was handled about as well as could be done in the circumstances. After balancing all the conflicting considerations, we conclude, in the light of the whole record and of Oses's recurrent misbehavior, that the trial judge did not act beyond his broad discretion described in the passage just quoted from the *Allen* case. See, to much the same effect, the remarks about the behavior of defense counsel of Spalding, J., in *Commonwealth v. McLaughlin,* 352 Mass. 218, 226–228 [224 N.E.2d 444], cert. denied, 389 U.S. 916 [88 S.Ct. 250, 19 L.Ed.2d 268] (1967).

### Miscellaneous Issues

Because we affirm the convictions, we mention other matters discussed in Oses's brief:

(a) Judge No. 2, when Oses attempted to demonstrate by a photograph that a prosecution witness was not truthful, remarked (Tr. 11:95), "You can do that when you testify, I suppose." This suggestion was promptly corrected (at the prosecutor's request) by a cautionary instruction by the judge that he should have "qualified" the comment "by saying that, if he [Oses] chose to testify, he could then use the photograph. There is no obligation for him [Oses] to testify." We think that this prompt correction was sufficient, when taken with statements in the final charge that the Commonwealth must prove beyond a reasonable doubt every fact necessary to conviction, that the defendants had no obligation to testify, and about the presumption of innocence. Tr. 23:11–12.

(b) Oses's appellate counsel now asserts that the charge (Tr. 23:8), essentially in the

language of *Commonwealth v. Webster,* 5 Cush. 295 (1850), was in error because of a minor addition to the language of that case. In the context of the whole charge, see *Commonwealth v. A Juvenile (No. 2),* 396 Mass. 215, 218–219, [485 N.E.2d 170] (1985), we think that the additional language could not have misled the jury.

(c) There was no error in permitting the jury to hear an F.B.I. tape recording of what was asserted by the prosecutor to have been a telephone demand by Oses and his codefendant for a ransom of the victim by the latter's parents. Because of Oses's unwise insistence upon representing himself, the jury had been exposed for about a month to hearing Oses's voice in the courtroom. It was open to Judge No. 2 to decide, taking into account all the circumstances, that the tapes contained admissible, probative evidence and that it was for the jury to appraise whether Oses's voice had been recorded on the tape.

(d) Other issues argued in Oses's brief seem to us to have been within normal bounds of judicial discretion, e.g., the judge's failure (Tr. 2:32) to excuse a juror (described in the record only as "Miss B——) who admitted that she was "related to a police officer through marriage," which we interpret as having a brother in law or a more remote relative by marriage who was a police officer. A trial judge, actually in charge of jury selections, is in a far better position than are we to judge whether any particular juror is likely to be subject to bias or to be free from it.

*Judgments affirmed.*
By the Court (Kass, Cutter, & Smith, JJ.),
/s/ _____
Assistant
Clerk

Entered: November 21, 1988